of the real property of which Sophronia Rowland died seised, whether the whole of a one-fifth share which she originally devised to each one of her children, or a subshare carved out of this, must be treated as a distinct entity. Chaplin on Suspension of Power of Alienation (2d Ed.) §§ 102–104; Vanderpoel v. Loew, 112 N. Y. 167, 19 N. E. 481; Graham v. Graham, 49 Misc. Rep. 4, 97 N. Y. Supp. 779. Under the rule of construction here invoked, as to neither of these distinct portions of such real property is the power of alienation unlawfully suspended, since, upon the expiration of the second life in each one of these, there were persons in being who could convey the entire fractional part.

The interlocutory judgment must be affirmed, without costs, with leave to the defendants within 20 days after the entry of the order herein to withdraw their demurrers and answer the complaint upon the payment of $10 costs. All concur.

---

(155 App. Div. 339.)

### In re AFFLECK et al.

(Supreme Court, Appellate Division, Second Department. February 28, 1913.)

1. WITNESSES (§ 177\*)—COMPETENCY—TRANSACTIONS WITH DECEASED PERSONS.

Under Code Civ. Proc. § 829, providing that a party or person interested shall not testify in his own behalf against the executor of a deceased person concerning a personal transaction between the witness and decedent, except where the executor is examined in his own behalf or the testimony of decedent is given in evidence, a surviving trustee in a testamentary trust to pay the income to the cotrustee for her life, with remainder over to persons named, including the trustee, is not rendered competent to testify in a controversy between the executor of the cotrustee and the remaindermen involving the right to a stock dividend received by the trustee and cotrustee to statements by the cotrustee that the estate should have the stock dividend, and to statements by him to the cotrustee that a receipt of income was framed to cover any question that might arise, by the mere fact that the accounts and schedules of the proceedings of the trustee and cotrustee, signed only by the trustee, were introduced in evidence by the executor, and that the trustee on cross-examination testified that the cotrustee knew nothing of the details of the estate, and that the receipts of the cotrustee were introduced in evidence.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 718; Dec. Dig. § 177.\*]

2. TRUSTS (§ 272\*)—CAPITAL AND INCOME—WILLS—ESTOPPEL.

Testator gave his residuary estate, consisting of corporate stock, to his wife and nephew, in trust to pay the income to the wife for life, with remainder over. During the existence of the trust the corporation declared a stock dividend. The wife, on being informed that the corporation might declare a stock dividend, stated that the estate should have such dividend. She signed vouchers, acknowledging payment in full of her distributive share of the income, which did not include the stock dividend. The vouchers were prepared by counsel at the request of the nephew. *Held*, that the wife's executor was not estopped from claiming the stock dividend as income.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 383–385; Dec. Dig. § 272.\*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

**3. TRUSTS (§ 272\*)—CAPITAL AND INCOME—STOCK DIVIDENDS.**

Whether a testamentary gift of corporate stock to trustees to pay the income to a beneficiary for life, with remainder over, passes to the life beneficiary a stock dividend declared during the existence of the trust by the corporation out of the accumulated surplus, and allotted to the stockholders, in the absence of anything to show when the surplus accrued, quære.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 383–385; Dec. Dig. § 272.\*]

Appeal from Surrogate's Court, Westchester County.

In the matter of the judicial settlement of the account of proceedings of Lizzie D. Affleck and James G. Affleck, as trustees. From a decree of the Surrogate's Court, E. Dudley Barlow, executor of Elizabeth D. Affleck, deceased, appeals. Reversed, and new trial granted.

See, also, 142 App. Div. 944, 127 N. Y. Supp. 1109.

Argued before JENKS, P. J., and HIRSCHBERG, BURR, WOODWARD, and RICH, JJ.

E. Dudley Barlow, of New York City, in pro. per.

Michel Kirtland, of New York City, for respondents.

WOODWARD, J. This is a controversy between the representative of a life tenant and the remaindermen under the will of James Affleck, who died in November, 1900, in respect to 54 shares of corporate stock.

The testator, after certain other bequests, gave the residue of his estate to his widow, Elizabeth D. Affleck, and a nephew, James G. Affleck, executors of the will, in trust to collect and pay the income to her during her life, and the remainder to other persons, including the nephew James G. Affleck. Among the assets of the estate were 150 shares of the capital stock of the Pullman Company and other securities. On November 14, 1906, this company, whose assets were then some $27,000,000 in excess of the par value of its stock, passed a resolution that $26,000,000 of this surplus be capitalized, and for that purpose that its capital stock be increased from $74,000,000 to $100,-000,000 by the issuance of $26,000,000 additional stock, the increase, with the necessary additional stock held in the treasury, to be distributed to the stockholders at a certain ratio. As a result of this, the executors or trustees received on the 30th day of November, 1906, 54 additional shares of the stock. The stock was worth, as it appears, $254 a share at that time and $189 thereafter. Elizabeth D. Affleck died at the age of 70 odd years, testate, on the 25th day of February, 1908, and the appellant Barlow, having been appointed executor of her will, laid claim, on an accounting by the surviving trustee in the Surrogate's Court in Westchester county, to the 54 shares of stock as income of the trust estate.

[1] The surrogate found, as matter of fact, that the trustees and all parties in interest had determined that said stock should be held as principal, and that they were bound by that determination. That finding of fact presents the principal question for review on this appeal. It rests in part, largely, as we assume, on the testimony of the

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

surviving trustee, James G. Affleck. He testified to a conversation between himself and the deceased life tenant in October, 1906, in which he told her, in effect, that he did not think they should continue to hold the Pullman Company stock; that the residuary legatees wanted it sold; that, if there should be a dividend, she as life tenant would be the gainer and the trust estate the loser. To this she replied, as he says:

"Uncle James [the testator] thought a great deal of Pullman stock, and I do not want to see it sold; but there is one thing about it, the estate will not lose anything by it."

He further testified that he "had fully explained to her the difference between dividend and extra issues of stock," to which she replied:

"If they do declare it as a dividend, I will see that the estate will get it, but I will get the increased income on it, will I not?"

He answered, "Yes." "So the whole matter rested," he says, adding, "and I reported to the other residuary legatees." This constitutes the principal part of his testimony on that subject. The executor of the estate of the life tenant objected to the evidence as incompetent under section 829 of the Code, and moved to strike it out on the same ground. The objection, as well as the motion, being overruled, he excepted.

That section provides that:

"Upon the trial of an action or the hearing upon the merits of a special proceeding, a party or a person interested in the event, * * * shall not be examined as a witness, in his own behalf or interest, * * * against the executor, * * * of a deceased person, * * * concerning a personal transaction or communication between the witness and the deceased person * * * except where the executor, * * * is examined in his own behalf, or the testimony of the * * * deceased person is given in evidence, concerning the same transaction or communication."

The witness was not only a party to the proceeding, but one of the remaindermen of the trust estate, and therefore interested in the event. He was examined in his own behalf and interest concerning a conversation with the deceased life tenant, and in respect to a matter which was made the turning point in the case. The executor was not examined at all. Neither was any testimony of the deceased person given in evidence. In short, this testimony was, upon the face of it, clearly inadmissible.

The learned surrogate overruled the objection to the evidence and to the motion to strike it out, on the grounds stated in his opinion (1) that the objectant had offered in evidence the account of the trustees showing that the 54 shares of stock had been treated as principal of the trust estate; (2) that no objection was taken to the introduction in evidence by respondent of certain receipts for income signed by the deceased life tenant, nor to an unsigned statement of income and disbursements of the trustees for the year ending February 28, 1907; and (3) that the attorney for objectant cross-examined the witness "upon the same subject" and thus opened the door for his testimony.

It appears that the witness James G. Affleck not only had full charge of the trust estate, but of Mrs. Affleck's private papers; that he had

possession of her check book, deposited her money, drew her checks, and the like. He admitted that she "knew nothing whatever about the details of the Affleck estate." But, in answer to a subsequent leading question by his counsel, he said that, "in a general way, she had knowledge of all that was done."

The account and schedules of their proceedings, as trustees, offered in evidence by the appellant, were not signed by her, but by James G. Affleck throughout, and verified by him after her death. The introduction of that account did not, under the circumstances and the purpose for which it was used, open the door to him to testify to the alleged conversation with the decedent. Besides, the conversation amounted at most to a mere promise on her part that, "If they do declare it as a dividend, I will see that the estate will get it."

[2] Of course, the introduction in evidence by respondent of the vouchers signed by Mrs. Affleck did not open the door to him to testify to any conversation with her. Nor do they, as we think, under the circumstances disclosed, estop her representative from claiming the stock in question. The first of the vouchers, dated February 24, 1905, was for $1,581.16 "in payment of balance of income for the year ending February 28, 1905, as per statement rendered," and signed by the deceased life tenant. The second, dated February 28, 1906, was in the same form, for $2,205.93. The third and last one, dated February 28, 1907, was for $10,055.23, "in payment in full, of my distributive share of income, for the year ending Febr'y 28th, 1907." The surviving trustee had previously taken counsel of his attorney as to whether the 54 shares of stock was principal or income, and on his advice that it was principal placed it on that side of the account, and had the attorney prepare this last receipt. This advice of counsel was long after the alleged promise of the life tenant that the estate should have the stock, yet nothing seems to have been said about that promise, nor does it seem to have been the moving cause for treating the stock as principal. The respondent testified, however, over objection that he was incompetent under the Code, that he told Mrs. Affleck that this receipt was drawn or the form of it given by the attorney "to cover any possible question that might arise." This testimony was clearly inadmissible. Not only so, if Mrs. Affleck were willing that the stock should go to the trust estate, there was no necessity for resort to counsel or the form of a receipt for income to cover that question.

The cross-examination did not open the door to any of this testimony. The nearest approach to it, so far as we can discover, was the question to the witness, "You knew that Mrs. Affleck as executor knew nothing whatever about the details of the Affleck estate?" and to which question he answered, "Yes." That did not open the door to the incompetent evidence already given, nor waive the objection and exception to it. Our conclusion is that the decree appealed from should be reversed.

[3] A considerable portion of the briefs of counsel herein is devoted to the vexed question—not passed upon by the surrogate—whether the 54 shares of stock in dispute belong to the life tenant or

to the remaindermen, independent of the alleged promise of the testatrix that the stock should go to the trust estate.

In McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230, the Western Union Telegraph Company, capitalizing accumulated earnings, increased its capital stock, and made thereon a stock dividend of 10 per cent. to its stockholders. The trustees under the will of Caroline Cuyler, deceased, holding stock in the company, received a portion of the dividend. The decision of the referee, awarding the dividend to the life tenant, was affirmed at General Term (92 Hun, 607, 38 N. Y. Supp. 1146), and by the Court of Appeals on a full review of authorities.

In the Lowry Case, 172 N. Y. 137, 64 N. E. 796, the Pullman Company declared a 50 per cent. stock dividend upon surplus profits which had existed at approximately the same figure for a time prior to the testator's death. The trustees under his will, holding certain shares in the company, received a portion of the dividend. The Appellate Division (56 App. Div. 408, 67 N. Y. Supp. 759), holding that the dividend belonged to the life tenant, said in part:

"The law seems to be well settled, in this state at least, that a cash dividend is income, and goes to the life tenant, no matter at what time the profits from which the dividend is declared may have accrued or have been accumulated"—citing Matter of Kernochan, 104 N. Y. 618, 11 N. E. 149; Matter of Rogers, 22 App. Div. 432, 48 N. Y. Supp. 175; s. c., 161 N. Y. 108, 55 N. E. 393.

And further holding, in effect, that such a dividend must in principle be considered the same as a dividend in money, awarded the stock to the life tenant. This was affirmed by the Court of Appeals, and on the same principle. For the court, per Gray, J., having said in substance that, if the dividend had been declared and paid in cash, there would have been no doubt about the life tenant's right to it, held, in effect, that there is no substantial distinction, as to ownership, between stock and cash dividends, so long as they are based on earnings.

In the Robertson Case, 188 N. Y. 301, 80 N. E. 938, one company declared and paid a cash dividend out of surplus earnings, and another company cash and stock dividends. Portions of the dividends of both companies came to the hands of testamentary trustees holding stock in the companies. The Appellate Division, holding (111 App. Div. 882, 98 N. Y. Supp. 15) that all these dividends should go to the life tenant, said, on a review of authorities, that:

"It is now established that, when the profits or surplus of a corporation, which it has earned or realized in the management of its business, are paid to its stockholders by way of dividends, whether such profits or surplus has been earned before or after the creation of the trust, so long as the amount that is actually distributed is actual surplus earned, or income or profits made by the corporation in its business and distributed as such, it is income or profits which go to the life tenant."

The Court of Appeals, affirming this decision, said among other things, that:

"The assets remain, at all times, the property of the corporation 'until a division is made or a dividend is declared.' * * * 'The stock [original

holdings] becomes vested in the trustees, * * * and as a consequence the dividends * * * become payable to the trustees, and are to be regarded, like all other income of the trust fund, as the absolute property of the life tenant.' "

In view of the foregoing authorities, this court felt constrained, in the very recent Matter of Osborne, 153 App. Div. 312, 138 N. Y. Supp. 18, to hold that stock issued by a corporation upon a capitalization of its surplus earnings belonged to the life tenant, although a part of the surplus accrued before the creation of the trust. However, I expressed the opinion in that case that:

"If this were an open question, I should be inclined to hold that the interest of the testator in so much of the surplus earnings as had accrued up to the time of his death constitutes, as between the life tenant and the remaindermen, not income or profits, but a part of the principal or trust estate itself, that a corresponding interest in the surplus earnings which thereafter accrued is income or profits, and that the 2,920 shares, issued upon the combined surplus, represent both principal and income, and, after payment of the expenses of administration, should be apportioned between these two classes of claimants."

Our attention was not then called to the recent decision of the Court of Appeals in Matter of Harteau, 204 N. Y. 292, 97 N. E. 726, or, if so, we overlooked it. In that case the corporation increased its capital stock, declared a cash dividend, and gave the stockholders the privilege of subscribing for additional stock at par, to the extent of their respective dividends. The trustees under Harteau's will, availing themselves of this privilege, subscribed for additional stock to the extent of the dividend awarded them on their original holdings. They subsequently sold the stock, and a dispute arose between the life tenant and remaindermen as to who were entitled to the proceeds of the sale. The court held that that question "depends upon the time of the acquisition of the surplus which was divided." The surrogate having found that 89 per cent. of the surplus accrued between the time, or shortly after the time, of the death of the testator and the resolution for the dividend, the court held that 80 per cent. of the dividend was to be deemed income. This is contrary to our understanding of previous decisions already cited. But, whether it is so or not, there is nothing in the present case to show when the surplus accrued. Nor do we now decide that we would or would not apportion it, in any event.

The decree appealed from is reversed for the errors in the admission of evidence, and new trial granted, costs to abide the final award of costs. All concur.